## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **LUCINDA BURNS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No.** _____ |
| ) | |
| **SMILE DESIGN ELLSWORTH,** ) | |
| **P.C.,** a professional corporation ) | |
| organized and existing under the laws ) | |
| of the State of Maine, ) | |
| ) | |
| **ELEVATE DENTAL** ) | |
| **EXTRACTIONS, P.C.,** a professional ) | |
| corporation organized and existing ) | |
| under the laws of the State of Maine, ) | |
| ) | |
| and ) | |
| ) | |
| **DR. AARON PALMER,** an individual ) | |
| residing in the Town of Scarborough, ) | |
| County of Cumberland, and ) | |
| State of Maine ) | |
| ) | |
| Defendants. ) | |

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lucinda Burns, also known by her nickname "Terra" (hereinafter "Plaintiff" or "Burns"), by and through undersigned counsel, hereby complains against Smile Design Ellsworth, P.C., Elevate Dental Extractions, P.C., and Dr. Aaron Palmer (collectively, "Defendants") as follows:

**INTRODUCTION**

1.     Dr. Aaron Palmer ("Dr. Palmer") is a Maine licensed Doctor of Dental Medicine who primarily resides in Scarborough, Maine. Despite maintaining a primary residence in Scarborough, at all times herein relevant, Dr. Palmer owned a dental practice located in Ellsworth, Maine.

2.     Although he was her boss, Dr. Palmer pursued an extramarital affair with his employee, Plaintiff Lucinda Burns, also known as Terra Burns (hereinafter "Burns"), which continued with her consent for years. However, once Dr. Palmer's wife found out about the affair, Dr. Palmer fired Burns quite literally "because" of "sex." During Burns' employment, Dr. Palmer not only took advantage of her sexually while occupying a position of power as her boss, but he also took advantage of her financially by failing to pay overtime under Maine law as well as the Federal Fair Labor Standards Act.

3.     This case arises under the Federal Fair Labor Standards Act, 29 U.S.C. §§ 206(a) and 215(a)(3), ("FLSA"); Maine's Minimum Wage and Overtime Law ("MWOL"), 26 M.R.S. §§ 664 and 670; Maine's Timely and Full Payment of Wages Law ("TFPWL"), 26 M.R.S. §§ 621-A and 626; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq.*; and the common law (defamation, tortious interference).

4.     Burns alleges unpaid overtime wages, willful and intentional sex-based discrimination against her, retaliation under the MHRA, defamation, and tortious interference with economic advantage in her employment.

## JURISDICTION, PARTIES, AND VENUE

5.     Plaintiff Lucinda (also known as Terra) Burns (hereinafter "Plaintiff" or "Burns") is an individual residing in the City of Ellsworth, County of Hancock, and State of Maine.

6.     Defendant Dr. Aaron Palmer ("Dr. Palmer") is a Maine licensed Doctor of Dental Medicine who primarily resides in the City of Scarborough, County of Cumberland, and State of Maine, who also owns property in Ellsworth, Maine, where he owned dental practices for years.

7.     Defendant Smile Design Ellsworth, P.C. ("Smile Design") is a Maine professional corporation organized and existing under the laws of the State of Maine, which during Burns's employment operated a dental practice located in Ellsworth, Maine.

8.     Defendant Elevate Dental Extractions, P.C. ("Elevate") is a Maine professional corporation organized and existing under the laws of the State of Maine, which during Burns's employment operated a dental extraction practice located in Ellsworth, Maine.

9.     Upon information and belief, at all times relevant after 2018, Smile Design and Elevate shared common ownership and management of labor relations.

10.     Upon information and belief, at all times relevant, Smile Design and Elevate existed separately but functioned in unison to administer labor relations and human resources functions.

11.     Upon information and belief, at all times herein relevant after 2018, Smile Design and Elevate had centralized control of all high-level corporate governance, finance, management, and control, such that the two entities are either joint employers or an integrated enterprise under the laws of the State of Maine.

12.     At all times herein relevant after 2018, Defendant Dr. Plamer owned and operated both Smile Design and Elevate, bearing direct responsibility for its day-to-day operations, contract negotiations, payroll management, and oversight of all employees.

13.     Plaintiff Terra Burns ("Burns") is a 37-year-old female and a licensed Certified Dental Assistant.

14.     Burns began working as a Certified Dental Assistant for Dr. Palmer in April of 2012 for a starting hourly wage of $17.00 per hour.

15.     The dental practice where Burns primarily worked was Smile Design.

16.     Elevate was Dr. Palmer's second office/practice where he performed extractions. Beginning in 2018, Burns worked at Elevate approximately twice a month for a stipend of $2,000 per week.

17.     Upon information and belief, these two dental practices are an integrated enterprise and/or joint employer with between 10 and 15 employees.

18.     Prior to filing this Complaint, Burns filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC"). Burns received a notice of right to sue letter from the MHRC on or about May 30, 2024.

4

## BACKGROUND FACTS

19.     Burns performed her job duties satisfactorily the entire time she worked for Defendants, beginning in April of 2012.

20.     After several months working for Defendants, Burns became the lead dental assistant. When Burns started working for Dr. Palmer, his daily production was about $3,000 to $4,000 per day. When Burns left employment in January of 2023, Dr. Palmer's average daily production was between $8,000 and $10,000.

21.     Between 2012 and 2019, Burns worked roughly 45 hours per week Monday through Friday.

22.     From 2018 to the date of her termination from employment, neither Smile Design nor Elevate paid Burns for overtime hours worked.

23.     As far as Burns was aware, no one at either practice clocked in or out during lunch breaks. Burns was so busy at both Smile Design and Elevate that she rarely was able to take more than fifteen minutes to quickly eat lunch, and she usually worked while eating.

24.     In May of 2019, a hygienist named Eliza Murphy ("Murphy") learned that she was the only person who clocked out for lunch. She was extremely upset. She gathered her saved timesheets and added up all of lunch times. The amount of time totaled around $40,000 to $50,000. Murphy threatened to get a lawyer and bring a wage claim against Dr. Palmer. Rather than paying Murphy the time she thought was missing, Dr. Palmer gave her an antique car that his father had gifted him.

25.     The next day, May 15, 2019, Dr. Palmer came into work and fired Misti, his former office manager. Dr. Palmer also fired another employee named Victoria a few weeks later. After that, Dr. Palmer paid more attention to payroll and timesheets. He would not allow employees to work overtime and get paid time and a half. Instead, he would only allow employees to bank earned time for hours worked over 40 and use them in another week, which also violated state and federal law.

26.     Burns noticed that Dr. Palmer seemed unstable since 2012. Not long after Burns started working for the Smile Design, Dr. Palmer went through a deep depression and could barely see patients. He lost a significant amount of weight.

27.     When Dr. Palmer was going through this depression, he and Burns started to become more friendly in addition to working closely together.

28.     Back in 2012, Dr. Palmer would break down and cry in his office roughly once a month. Burns felt responsible for trying to keep him happy and assisting him so that the practice would run smoothly.

29.      In September of 2013, Dr. Palmer started flirting with Burns. He was not professional about discussing his sex life at home and everyone in the office knew that he and his wife did not have a sexual relationship. At first, Burns was not overly concerned about Dr. Palmer's flirtatious behavior because he was very friendly to everyone in the office.

30.     As time went on, however, Dr. Palmer started texting Burns personal information. She felt awkward about these texts at first and was not sure how to respond.

31.     The relationship between Burns and Dr. Palmer slowly progressed and became more overtly sexual. Burns worked right next to Dr. Palmer all day long, sitting in a chair in close proximity to him. At one point, Dr. Palmer let his leg brush up against Burns or rested against her leg during a procedure.

32.     Burns thought the behavior may have been intentionally sexual, but at the same time on another occasion she walked by and saw Dr. Palmer and Victoria (an assistant) working together and it looked like they were touching.

33.     In October of 2013, Burns went to find Dr. Palmer for anesthesia during a procedure. Burns came around the corner to his office like she always did, but this time Dr. Palmer grabbed Burns and kissed her, using his tongue.

34.     Burns was very surprised by Dr. Palmer's sexual advance. She gently pushed away and said she needed him for anesthesia. For a few days after the kiss, things were very awkward between them at work.

35.     Several weeks later, Dr. Palmer and Burns were sitting having lunch in the office. Dr. Palmer grabbed Burns's foot and started rubbing it. By this point, Burns was becoming intrigued and interested in Dr. Palmer sexually, even though she was married.

36.     Burns loved her job at Smile Design and wanted to make it the best and most successful dental office possible. She and Dr. Palmer got along and worked well together. Dr. Palmer made Burns feel excited to learn more about dentistry and she was very committed to growing the business.

37.     On November 11, 2013, Dr. Palmer and Burns were alone at the office. They had only one patient that morning. After Dr. Palmer completed the procedure, he immediately kissed Burns and they ended up having sex on the basement floor. Burns felt tremendous guilt and remorse the next day and did not know what to do.

38.     Dr. Palmer did not discuss the above sexual encounter with Burns for a few days, but then he began flirting with her much more. After this point, their affair became more serious. Dr. Palmer bought gifts for Burns, including a light for her loupes, which cost more than $1,400.00.

39.      Burns worried that her coworkers suspected the affair, but no one said anything about it. Amy and Liza (the hygienists) always told people Dr. Palmer and Burns were just close friends.

40.     In January of 2014, Burns attended a dental convention with Dr. Palmer and others from the office. Burns was emotional and upset about what was happening with Dr. Palmer, and the fact that she was at the convention with him and not home with her family.

41.     Burns cried throughout the entire convention. She had to get up and leave a class that she took with Dr. Palmer because she was about to cry. Dr. Palmer followed Burns out of the class because she could not stop crying.

42.     Burns told Dr. Palmer that she was thinking about getting another job because she needed to separate herself from him and the situation.

43.     While they were still at the convention, Dr. Palmer came back to Burns's hotel room and said he wanted to be "comforting." They ended up having sex and

Burns immediately got upset again. She told Dr. Palmer she wanted to go home. Dr. Palmer walked Burns to her car. After leaving the convention early, Burns cried the entire way home and could not wait to get back to her family.

44.     After the convention, Burns wanted the affair to end and wanted her job to be normal again.

45.     The day after the convention, Burns got a text from the office manager, Lynn. She said that the hygienists (Amy and Liza) were suspicious of what went on between Burns and Dr. Palmer, because Burns left the convention abruptly. The hygienists also heard that Dr. Palmer was "comforting" Burns in the hallway as she cried, and they found tissues on the floor of her hotel room by the bed.

46.     Dr. Palmer sent out a group text to everyone, stating: "Terra is in an emotional state right now and thinking about leaving the office." He asked everyone to "be there" for Burns. The affair between Burns and Dr. Palmer fizzled at that point, and there were no romantic interactions between her and Dr. Palmer for roughly a year while she continued working for Smile Design.

47.     Dr. Palmer started the Elevate extraction practice in 2018. Burns worked extensively on helping Dr. Palmer start up this separate practice, but he did not put Burns on the payroll in the ordinary course.

48.     Burns worked with Dr. Palmer at Elevate two to three times per month. Dr. Palmer had the Elevate office pay her a check once a month. Dr. Palmer told Burns that she would be paid $40.00 per hour.

49.     Between Smile Design and Elevate, Burns worked 5 days per week for Dr. Palmer, and she routinely worked more than 40 hours per week. Defendants never paid Burns overtime. Eventually Dr. Palmer just gave Burns a stipend of $2,000.00 per month for her work at Elevate, without accounting for her hours worked between the two practices.

50.     Between 2015 and 2021, Burns's affair with Dr. Palmer ebbed and flowed. They would become romantic for several months or so, and then end it again. When Burns felt guilty about having an affair with Dr. Palmer, she often told him she wanted to get a different job to make things less stressful, but he insisted that she continue working for him.

51.     In 2021, Dr. Palmer handed Burns a check for $5,000.00. He knew Burns was getting a car and said he wanted to help with the down payment.

52.     In January of 2021, as a "bonus," Dr. Palmer put Burns on salary instead of paying her hourly at her former rate of $32.00 per hour. Dr. Palmer paid Burns a fixed salary of $36.00 per hour for 40 hours of work, plus the stipend from Elevate, regardless of the number of hours worked each week.

53.     In January of 2022, Dr. Palmer gave Burns an American Express credit card worth $5,000.00. Inside the card, he wrote: "It can't be overstated just how important you are to me! I want you to know that I recognize just how much of your personal time and energy you've put into making this a success. I can feel how much you really care… and I can't express how much that really means to me". Burns was very thankful for the gift and barely used the card.

54.    The $5,000.00 credit card in early 2022 reflected that the affair between Burns and Dr. Palmer had started back up again. Every time they became romantic again, it was initiated by Dr. Palmer. When the affair was active, Dr. Palmer would pay Burns more in bonuses and gifts.

55.    The affair became very intense in August of 2022, which led to feelings of extreme guilt, stress, and remorse on Burns's part. Around that time, she again expressed to Dr. Palmer that she wanted to leave the office and get a different job.

56.    Not only did the affair put tremendous stress on Burns, but there was a lack of management going on at the office, as well as interpersonal conflict, which was additionally upsetting to Burns.

57.    Burns became distant from Dr. Palmer and began looking for another job. The work environment had become both subjectively and objectively intolerable, amounting to a hostile work environment.

58.    Dr. Palmer responded to Burns's distance by pouring his heart out to her and professing his love for her. Dr. Palmer said that he could not live without Burns.

59.    Dr. Palmer sent Burns numerous texts reflecting the above sentiment and was aggressively pursuing Burns.

60.    Dr. Palmer even said he wanted to make Burns a partner in the practice and profit share with her. Dr. Palmer recognized all the hard work, blood, sweat, and tears Burns had put into making both practices successful for Dr. Palmer.

61.    Dr. Palmer wanted both businesses to be successful, and he felt that Burns was a critical part of making that happen.  Having convinced Burns once again not to leave employment, the affair with Dr. Palmer continued between August and October of 2022.

62.    In October of 2022, Burns attended a wedding with her husband. That morning, Burns's husband went through her phone and found texts between her and Dr. Palmer. He wanted an explanation, and Burns told her husband the truth about what had gone on with Dr. Palmer. Burns's husband had been unfaithful to her in the past, and she hoped he would forgive her given his own indiscretions, but he wanted a divorce.

63.    When Burns told Dr. Palmer her husband had found out about the affair, his biggest concern was that his wife was going to find out. Burns was worried about Dr. Palmer's wife finding out as well, because she did not want to lose her job and become a single mother supporting two children on her own.

64.    Dr. Palmer repeatedly offered to pay Burns's mortgage, car payment, and any bills she needed help with. Burns repeatedly declined.

65.    By November of 2022, Burns and her husband were living separately. Burns was at his house with their kids while her husband was out. Burns opened their shared laptop and saw that her husband's email was open.

66.    Burns found an email that Dr. Palmer had sent to her husband. In the email, Dr. Palmer offered to pay Burns's husband off in exchange for his silence. He was prepared to pay Burns's husband $50,000 up front, $50,000 in three months, and

"**as long as my family stays together, AND your family stays together, AND Terra is still able to work at the practice**," $50,000 per year "indefinitely."

67.     Burns was extremely upset when she saw Dr. Palmer's email to her husband. She went to work the next day in tears. Burns asked Dr. Palmer why he would do this, and he said he did not want to be without her at the office, and he wanted to compensate her husband so he could "keep" Burns. She was shocked and humiliated.

68.     Burns was infuriated that Dr. Palmer would make this offer to her husband without talking to her as well. Dr. Palmer said he would rescind the offer. Burns suspected that once she was separated and living on her own, Dr. Palmer was fearful that she would start dating. Dr. Palmer wanted to keep Burns with her husband, and also be able to have her romantically and professionally.

69.     Burns became increasingly uncomfortable at work from that point forward and she was an emotional wreck. Toward the end of 2022, Burns had two different job interviews, but her emotional and mental health was suffering significantly.

70.     Dr. Palmer continued trying to see Burns. On a few occasions, he arranged for them to meet at a hotel. Sometimes Burns would go, and sometimes she would cancel at the last second. Burns found another email where Dr. Palmer offered her husband a car in exchange for his silence. Burns realized that she wanted the affair to end.

71.    On January 18, 2023, Dr. Palmer begged Burns to meet him at a hotel. She did not want to go because she wanted to end the affair. Burns hoped to continue working at her job and just wanted things to be less uncomfortable. Burns tried to cancel plans to meet Dr. Palmer at the hotel, but he said he insisted he needed to see her. Burns relented and met him at the hotel.

72.    Dr. Palmer and Burns had sex on January 18, 2023 and then immediately went in to work. Burns had driven in Dr. Palmer's car to the hotel and accidentally left her toothbrush and toothpaste in the car.

73.    The next morning, Dr. Palmer messaged a work group chat at 3:00 am and said that he had a "family emergency" and he would not be in to work that day.

74.    Burns texted Dr. Palmer to ask if he was ok and he said "no." Burns asked, "Me?" and he said, "Yes." She became extremely upset and realized that Dr. Palmer's wife had found out about the affair.

75.    Burns did not hear anything from Dr. Palmer until later that day. She asked if she should find someone to step in for her for a few weeks at work while he figured out things with his family. He replied: "I am not doing this without you, I need you there, don't lose faith in me."

76.    Dr. Palmer called out the rest of the week and Burns continued to go to work. She did not hear from him until Saturday, January 21, 2023, when he sent an email firing Burns.

77.    Dr. Palmer offered to pay Burns for 8 more weeks, but he never paid the last $2,000. He also shut off the American Express credit card, which was a gift that was supposed to be for $5,000 but Burns had only used $1,800.

78.    Burns was completely crushed, devastated, fearful about her financial future, and blindsided by the termination.

79.    Burns had worked tirelessly to make the practice a success for ten years, and then Dr. Palmer fired her because of their sexual relationship.

80.    Burns now earns $20.00 less per hour and she has to support her children as a single mother.

81.    In one email, Dr. Palmer apologized and told Burns that he "forced" her into the situation between them, including the affair and her termination.

82.    Even though the sexual relationship between Burns and Dr. Palmer was consensual, he conditioned the terms and privileges of her employment on sex and made her uncomfortable about leaving her job and/or ending their affair on multiple occasions for years before firing her.

83.    One of Dr. Palmer's hygienists, Amy, messaged Burns on May 5, 2023. She said: "Keep me posted about the lawsuit," and suggested that she did not want to get subpoenaed to testify about whether or not the affair was consensual. It was obvious Dr. Palmer was telling his employees that Burns claimed the affair was nonconsensual.

84.    Burns does not claim that Dr. Palmer had sex with her without consent. Instead, Dr. Palmer was in a position of power over Burns. Dr. Palmer was Burns's

boss, the owner of both practices she worked for, and the person directly in charge of decisions about her pay and the terms and conditions of her employment.

85.     Dr. Palmer took advantage of Burns for years and exploited her because of her sex.

86.     In addition, after his wife discovered the affair, Dr. Palmer maligned and defamed Burns's professional reputation within his office and amongst his colleagues as well.

87.     Burns has not been able to find a comparable job since Dr. Palmer fired her. Upon information and belief, Dr. Palmer has contacted people with whom Burns has interviewed and told them not to hire her.

88.     Dr. Palmer's behavior toward Burns after his wife found out about the affair, including terminating her employment and defaming her, was retaliation for her opposing a practice made unlawful by Title VII.

89.     Upon information and belief, Dr. Palmer defamed Burns and ruined her professional reputation because she chose to exercise her rights under the Maine Human Rights Act.

90.     All of Dr. Palmer's conduct alleged herein was undertaken willfully or with reckless disregard.

## COUNT I – VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (29 U.S.C. §§ 206(a) and 215(a)(3))
### (All Defendants)

91.     Plaintiff repeats the allegations contained in Paragraphs 1 through 90 of her Complaint as if fully stated herein.

92.     When it comes to her work for Elevate, Burns did not meet the statutory definition of an "independent contractor" who should be paid a stipend to work for Elevate, because she was misclassified as an independent contractor when the realities of her role made her an "employee" of that practice under the Federal Fair Labor Standards Act ("FLSA").

93.     Smile Design and Elevate collectively suffered, permitted, and/or required Burns to perform work that amounted to more than forty hours per week, without paying her overtime or even an hourly wage.

94.     According to the definitions and regulations related to exemptions from the requirement to pay overtime under the FLSA, Burns's job duties did not meet the test for any exemption from the requirement to pay overtime. Defendants' decision to put Burns on a "salary" for 40 hours of work per week violated the FLSA.

95.     Defendants were aware that Burns was performing work for each practice, but intentionally failed to compensate her for all hours worked.

96.     Dr. Palmer is considered an employer in his individual capacity under the FLSA because he exercised operational control over the method of payment for employees in general as the owner of each practice.

97.     More specifically, Dr. Palmer exercised personal, direct control and bore direct responsibility for the decision not to compensate Burns for work she performed for both Elevate and Smile Design without payment.

98.     Dr. Palmer intentionally defrauded Burns of wages owed to her.

99.     Defendants violated the FLSA by failing to keep accurate payroll records indicating the true number of hours Burns worked for the two practices each week.

100.    Dr. Palmer personally exercised operational control over the manner and method of paying employees, including Burns, and he personally made the decision to deprive her of wages owned under the FLSA.

101.    Defendants willfully and knowingly failed to pay Burns minimum and overtime wages for work performed within two and/or three years of the filing of this Complaint.

102.    As a result of Defendants' willful violations of the FLSA, Burns has suffered and is entitled to statutory unpaid wages, liquidated damages, along with attorney's fees, costs, interest, and equitable/injunctive relief.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendants' violation(s) of the FLSA, including unpaid minimum wages, liquidated damages, injunctive and equitable relief, attorney's fees, costs and expenses, interest, and all other relief afforded to her by law.

### COUNT II - UNPAID OVERTIME UNDER MAINE'S MINIMUM WAGE AND OVERTIME LAW (26 M.R.S. § 664; 670)

103.    Plaintiff repeats the allegations contained in Paragraphs 1 through 102 as if fully stated herein.

104.    Defendants failed to pay Burns overtime wages and minimum wages within six years of filing this Complaint.

105.    According to the definition set forth in 26 M.R.S. § 663(3)(C), Burns's employment did not meet the test for an exemption from the requirement to pay overtime.

106.    For all of the reasons stated above, Defendants failed to pay Burns one and one-half times her regular rate of pay (time and a half) for all hours worked over forty in one workweek.

107.    As a result of Defendants' failure to pay overtime and minimum wages due, Burns is entitled to unpaid overtime as well as an additional amount as liquidated damage, plus costs of suit and attorney's fees.

108.    Under the facts of this case, individual liability may be imposed against Dr. Palmer personally because he controlled the manner and method of payment for Burns and whether she was paid overtime.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages in the form of unpaid overtime, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT III – VIOLATION OF THE MAINE TIMELY AND FULL PAYMENT OF WAGES LAW ("TFPWL")
### (26 M.R.S. § 621-A and 626)
### (All Defendants)

109.    Plaintiff repeats the allegations contained in Paragraphs 1 through 108 as if fully stated herein.

110.    Defendants failed to pay Burns hourly wages while she worked for Elevate, instead paying her a stipend that was more in the nature of independent

contractor work, even though Burns's job duties did not qualify as an independent contractor, and in fact she had no contract with Defendants.

111.    The two practices combined failed to pay Burns wages owed for work she performed in excess of forty hours within six years of filing this Complaint, in violation of the Maine Timely and Full Payment of Wages Law ("TFPWL").

112.    Defendants furthermore failed to pay Burns all wages owed to her within a reasonable time after cessation of her employment under 26 M.R.S. § 626.

113.    Under the penalty provisions of the TFPWL, Burns is entitled to an amount equal to three times the amount of her unpaid wages, plus reasonable attorney's fees, interest, and costs of suit.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court enter judgment in her favor and against Defendants and award her damages in the form of unpaid wages, liquidated damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT IV – SEX-BASED DISCRIMINATION
### (TITLE VII - 42 U.S.C. § 2000e *et seq.*)
### (Defendant Smile Design)

114.    Plaintiff repeats the allegations contained in Paragraphs 1 through 113 of her Complaint as if fully stated herein.

115.    Burns is a member of a protected class based on her gender.

116.    Title VII makes it illegal for an employer to discriminate against an employee on the basis of gender in compensation or in terms, conditions, or privileges of employment, or in hiring decisions.

117. Smile Design's actions described above amounted to sex-based discrimination in violation of Title VII, because Smile Design subjected Burns to unfair and discriminatory treatment in the terms and conditions of her employment because of sex.

118. Smile Design furthermore engaged in sex stereotyping of Burns, terminating her employment because she previous had a sexual relationship with Dr. Palmer.

119. As a result of Smile Design's sex-based discrimination and willful violation of Title VII, Burns has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendant Smile Design's violation(s) of Title VII in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT V – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e *et seq.*)
### (Hostile Work Environment)

120. Plaintiff repeats the allegations contained in Paragraphs 1 through 119 of her Complaint as if fully set forth herein.

121.    In addition to the allegations of sex-based discrimination set forth above, Defendant Smile Design subjected Burns to a hostile working environment in violation of Title VII.

122.    The work environment at Smile Design was both objectively offensive to any reasonable person and subjectively offensive to Burns at various times throughout her employment, to the point where she looked for other employment on numerous occasions, only to have Dr. Palmer dissuade her from leaving.

123.    The harassment that Burns experienced based on her sex while working for Smile Design was severe and pervasive.

124.    Employer liability exists in this case because Dr. Palmer was the owner of each business that Plaintiff worked for, he initiated a sexual relationship with her, and then terminated her for engaging in that sexual relationship.

125.    As a result of Defendant's discrimination and willful violation of Title VII, Burns has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT VI – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII**
**(42 U.S.C. § 2000e *et seq.*)**
**(Quid Pro Quo Sexual Harassment)**

126.    Plaintiff repeats the allegations contained in Paragraphs 1 through 125 of her Complaint as if fully set forth herein.

127.    For all of the reasons set forth above, Burns was subjected to unwelcome sexual advances, harassing conduct, and other discrimination based on sex. When Burns failed to succumb to the sexual relationship between her and Dr. Palmer, he retaliated against her.

128.    Burns's continued employment at Smile Design was in fact, literally, conditioned upon her having sex with Dr. Palmer. When the sexual relationship ended, her employment did as well.

129.    A continuing violation of Title VII has occurred in this case.

130.    As a result of Defendant's discrimination and willful violation of Title VII, Burns has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT VII – VIOLATION OF THE MAINE HUMAN RIGHTS ACT**
**(5 M.R.S. § 4571 *et seq*.)**
**(Hostile work environment, discrimination based on sex,**
**sex stereotyping, quid pro quo)**
**(Defendant Smile Design)**

131.    Plaintiff repeats the allegations contained in Paragraphs 1 through 130 of her Complaint as if fully set forth herein.

132.    For the reasons set forth above, unlawful sex-based discrimination has taken place within the meaning of the Maine Human Rights Act.

133.    As a result of Smile Design's discriminatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, liquidated and punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT VIII – RETALIATION IN VIOLATION OF THE**
**MAINE HUMAN RIGHTS ACT**
**(5 M.R.S. § 4572(1)(E))**

134.    Plaintiff repeats the allegations contained in Paragraphs 1 through 133 of her Complaint as if fully set forth herein.

24

135.    For the reasons set forth above, unlawful retaliation has occurred in this case because Plaintiff opposed practices made unlawful by Title VII and the Maine Human Rights Act ("MRHA").

136.    Plaintiff engaged in protected activity under Title VII and the MHRA by filing a charge of discrimination with the Maine Human Rights Commission accusing Defendant of sex-based discrimination resulting in her termination.

137.    As a result of this protected activity, Smile Design, by and through its agent Dr. Palmer, engaged in adverse action that had a negative impact on Burns's ability to earn a living and seek employment, by bad-mouthing her to prospective employers.

138.    Plaintiff's protected activity bore a causal connection to Defendant's adverse action.

139.    As a result of Smile Design's retaliation, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, liquidated and punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendant's violation(s) of the MHRA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to them by law.

## COUNT IX – OPPOSING A PRACTICE MADE UNLAWFUL BY TITLE VII
### (42 U.S.C. § 2000e *et seq.*)
### (Defendant Smile Design)

140.    Plaintiff repeats the allegations contained in Paragraphs 1 through 139 of her Complaint as if fully set forth herein.

141.    Plaintiff opposed a practice made unlawful by Title VII as described in Count VIII above.

142.    As a result of Plaintiff's protected conduct, Smile Design took adverse action against her.

143.    Smile Design took adverse action against Plaintiff, as set forth in detail above, bears a causal connection to them opposing practices made unlawful by Title VII.

144.    A continuing violation of Title VII has occurred in this case.

145.    As a result of Defendant's willful retaliation in violation of Title VII, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, liquidated damages, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT X – DEFAMATION
### (Defendants Smile Design and Palmer)

146.   Plaintiff repeats the allegations contained in Paragraphs 1 through 145 of her Complaint as if fully set forth herein.

147.   As set forth above, Smile Design, by and through its agent Dr. Palmer, as well as Dr. Palmer individually, made multiple false, defamatory, and unprivileged statements of fact about Burns to third parties, which statements directly disparaged her professionalism, credibility, work habits, and employability.

148.   Defamation *per se* has occurred in this case.

149.   There was no factual basis for Defendants' false and defamatory statements.

150.   Defendants' false and defamatory statements about Burns were made either with actual malice toward Burns or with reckless disregard to the truth or falsity of the statements, such that malice may be implied, sufficient to justify an award of punitive damages.

151.   Burns has suffered professional harm, actual damage, lost wages, personal injuries, severe emotional distress, and other damages as a result of Defendants' defamation.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendants' defamation and slander *per se*, actual damages, punitive damages, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT XI: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Defendants Smile Design and Palmer)

152. Plaintiff repeats the allegations contained in Paragraphs 1 through 151 of her Complaint as if fully stated herein.

153. As set forth above, upon information and belief, Dr. Palmer, individually and/or as an agent of Smile Design, contacted prospective employers with whom Burns interviewed and told them about the lawsuit, the affair, and/or that they should not hire Burns.

154. As a result of Defendants' tortious interference, Burns has not been able to find another job making as much money as she did at Smile Design.

155. As set forth above, Defendants' conduct was sufficiently willful and/or reckless to support an award of punitive damages.

WHEREFORE, Plaintiff Lucinda Burns requests that the Court award her damages for Defendants' tortious interference with prospective economic advantage, including actual damages, punitive damages, emotional distress and compensatory damages, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## JURY TRIAL DEMAND

Plaintiff Lucinda Burns hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: December 9, 2024                    /s/ Laura H. White

                                           _____
                                           Laura H. White, Bar No. 4025
                                           *Attorney for Plaintiff*
                                           WHITE & QUINLAN, LLC
                                           62 Portland Rd., Suite 21
                                           Kennebunk, ME 04043
                                           (207) 502-7484
                                           *lwhite@whiteandquinlan.com*


Dated: December 9, 2024                    /s/ Danielle Quinlan

                                           _____
                                           Danielle Quinlan, Bar No. 5480
                                           *Attorney for Plaintiff*
                                           WHITE & QUINLAN, LLC
                                           62 Portland Rd., Suite 21
                                           Kennebunk, ME 04043
                                           (207) 502-7484
                                           *dquinlan@whiteandquinlan.com*